**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AMOUND REGISTER,<br><br>Plaintiff,<br><br>v.<br><br>WARDEN KENNETH HOOVER<br><br>Defendants, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 1:26-CV-01278-SL<br><br>JUDGE SARA LIOI<br>UNITED STATES DISTRICT JUDGE<br><br>MAGISTRATE JUDGE<br>CARMEN E. HENDERSON<br><br>**REPORT AND RECOMMENDATION** |

## I. Introduction

Amound Register ("Petitioner") seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging his convictions for rape, complicity to commit rape, sexual battery, and endangering children, for which he is serving a sentence of sixty years to life in prison. (ECF No. 1). Also pending are Petitioner's motions for equitable tolling of the statute of limitations applicable to federal habeas claims and for a stay and abeyance of these proceedings while Petitioner exhausts his state court remedies. (ECF Nos. 2, 3). This matter was referred to the undersigned under Local Rule 72.2 to prepare a report and recommendation. Because the undersigned concludes that the petition is untimely and Petitioner is not entitled to equitable tolling, it is recommended that the Court deny the motion for equitable tolling, dismiss the petition as untimely, and deny the motion for stay and abeyance as moot.

## II. Factual Background

The Ohio Court of Appeals for the Eighth Appellate District set forth the following facts[1] on direct appeal:

> {¶3} On July 5, 2020, L.P. drove to the police station and confessed to having sex with her son, LP., who was 13 years old at the time. L.P. told the police that her child's father was using the fact that he had proof of her sexual activity with her son to threaten her regarding custody of their child together. In L.P.'s confession, she did not disclose any information regarding Register and I.P.'s sexual relationship. L.P. pleaded guilty to two counts of rape and two counts of child endangerment and was sentenced to ten years in prison.
>
> {¶4} In August of 2023, L.P. disclosed to the police that Register forced her to have sex with I.P. After L.P.'s sentencing, Register was charged with rape, complicity to rape, pandering obscenity, endangering children, sexual battery, tampering with evidence, and falsification.
>
> **A. L.P.'s Testimony**
>
> {¶5} At trial, L.P. testified that she went to the police station to confess to raping I.P. and to get help for her and her children. L.P. testified that Register started forcing her to have sex with I.P. in August 2019. She stated that the first time it happened, she was awakened to find that I.P. was naked on top of her. According to L.P., I.P. was rubbing, groping, and touching her, and she was naked as well. I.P. was 12 years old at the time. L.P. claimed that I.P. put his penis inside of her. L.P. noticed that there was a phone on the windowsill, and she assumed the phone was recording them.
>
> {¶6} L.P. got up from the bed to go to the bathroom. She noticed that Register was sitting on the couch, with no underwear on, masturbating. L.P. testified that Register told her to go back into the room and followed her back. L.P. got back in the bed and attempted to go to sleep. I.P. got into the bed, and they continued to have sex. L.P. testified that Register was watching them. When they were done, I.P. left the room, and Register and L.P. had sex.
>
> {¶7} L.P. testified that she engaged in this sexual behavior because it was what Register wanted, and she was scared. About ten days later, L.P. left and went to Connecticut to stay with her father. She stayed for approximately nine months, until May 2020. L.P. testified that she did not have sex with I.P. while in Connecticut.

---

[1] The facts found by the appellate court of record "shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

{¶8} While L.P. was in Connecticut, Register filed for emergency custody of his daughter, who was with L.P. L.P. returned to Ohio and moved in with Register. L.P. testified that while living with Register, he requested that she do a striptease for I.P., while Register watched. Several times, after the striptease, L.P. would have sex with I.P., at Register's demand, while Register masturbated or directed them on what to do. L.P. testified that Register was instructing I.P. on how to have sex with her. L.P. further testified that she, Register, and LP. would sometimes have threesomes, where she would take turns having sex with both Register and I.P.

{¶9} L.P. stated that she would perform oral sex on Register, and then Register would have I.P. perform oral sex on Register. L.P. testified that she did not know how many times the threesomes occurred, but recounted that they happened several times and often. L.P. also testified that the times she had sex with I.P., on her own, Register would record them, but she was not sure if he was actually recording their interactions.

{¶10} L.P. also stated that when she was done having sex with I.P. or done with the threesomes, she and Register would have sex, and then talk about the threesomes. L.P. also claimed that Register took a photo of her performing oral sex on I.P. because Register showed her the photo.

**B. I.P.'s Testimony**

{¶11} At the time of the trial, I.P. was 17 years old. I.P. testified that Register was like a father, or a stepfather to him, and he was L.P.'s boyfriend. I.P. testified that the nature of the relationship with Register changed when I.P. was ten years old. I.P. stated that Register introduced him to pornography and taught him how to masturbate. I.P. testified that he vividly remembered Register bringing I.P. into Register's bedroom and pornography was on Register's television. I.P. testified that the pornography showed a naked woman fingering herself. Register told I.P. that this was something he needed to learn eventually. I.P. did not tell anyone about this because he trusted Register as a father figure.

{¶12} I.P. testified that when he turned 11 years old, he and Register started masturbating together. I.P. also testified that he started having sex with L.P. around the same time. I.P. stated that he first watched his mother masturbate in their living room. Register was present. I.P. continued, stating that Register played a video on his laptop of L.P. masturbating, so he was used to seeing his mother sexually.

{¶13} I.P. testified that he was in a room playing video games when Register came and got him. Register took him to the living room, where L.P. was naked. L.P. asked I.P. what he wanted to see. I.P. responded with "I want to see you play with yourself." Tr. 604. L.P. masturbated while I.P. and Register watched. I.P. remembers being in 7th grade at the time. I.P. testified that it happened again, but this time I.P. and Register masturbated while watching his mother masturbate. Again, Register would get I.P. and take him into the room to watch L.P.

{¶14} I.P. then testified that eventually the encounters turned into threesomes where L.P. would perform oral sex on Register, and Register would instruct I.P. to put his penis in L.P.'s vagina. I.P. testified that this continued where it would start off with he and Register watching L.P. masturbate and then L.P. would sit on his lap. L.P. would eventually put I.P.'s penis inside of her vagina. I.P. testified that Register was also present, watching them and masturbating.

{¶15} I.P. recalled having conversations with Register about the sexual encounters. Register told I.P. that it was a learning experience, and he was teaching I.P. I.P. testified that sexual encounters happened countless times, at least three to five times a week.

{¶16} I.P. further testified that he and L.P. did not have sex when they moved to Connecticut. He stated that L.P. told him it was never going to happen again because it happened at Register's prodding. However, when they moved back to Ohio, the threesomes started again.

{¶17} I.P. testified that L.P. and Register were sharing a bed. They would wake I.P. up and L.P. would perform oral sex on Register. I.P. would have sex with L.P. from behind. I.P. also testified that Register would physically touch I.P.'s penis. I.P. further testified that Register would make him lick his testicles and penis at least three times. Register would also lick I.P.'s penis and testicles. I.P. continued his testimony and stated that Register performed oral sex on him and he on Register before I.P. moved to Connecticut. He testified that they were alone in a room, and I.P. was uncomfortable with the interaction. However, it occurred a couple of times.

{¶18} I.P. testified that he did not initially tell the police about Register when they first came to interview him because he loved and cared about Register. However, I.P. eventually told a social worker at the child advocacy center. I.P. then made a subsequent statement to the police. I.P. decided to make the disclosures after going to therapy. I.P. further testified that he had not had a conversation with his mother after she left the house to go to the police in July 2020. The only time he saw her after that was at her sentencing.

**C. Case Worker Christine Lee's Testimony**

{¶19} Christine Lee ("Lee"), child protection specialist for the Cuyahoga County Division of Children and Family Services ("CCDCFS") testified that she was assigned to the case after a police officer called the child abuse hotline. Lee testified that she investigates allegations of abuse and neglect on children and has training in forensic interviewing and a degree in education. Lee testified that she interviewed I.P. at the police station after L.P.'s disclosures. Lee had two interviews with I.P., the second one at the child advocacy center. Lee testified that I.P.'s mental health therapist contacted her and, based on what I.P. revealed in therapy, asked Lee to conduct a second interview with I.P.

> {¶20} Lee testified that during the second interview, I.P. made disclosures about the sexual involvement with Register. Lee was asked if she had interviewed other children who had been sexually abused, to which she answered in the affirmative. Then Lee was asked if it was uncommon for children to have multiple interviews with her, and Lee responded that it was not uncommon. Lee also testified that it was not uncommon for children to disclose information in a subsequent interview that they did not disclose in the first.
>
> …
>
> **D. Officer Harbeen Kaur Mileti's Testimony**
>
> {¶22} Officer Harbeen Kaur Mileti ("Ofc. Mileti") testified that L.P. initially made her disclosures to Ofc. Mileti about the sexual relationship between L.P. and I.P. L.P. told Mileti that she was involved in a custody dispute with Register, and he was using the fact that she was having sex with I.P. to control her with regards to custody of their daughter. Ofc. Mileti went to the shared home of L.P. and Register to interview Register, who was in the home. Register told Mileti that he took a photograph of I.P. and L.P. engaged in sexual activity. Register also stated that he would bring the photograph to the police station at a later time.
>
> {¶23} Ofc. Mileti asked Register if he wanted to make a written statement. Register said that he would. Register was provided a statement form and an extra page for more details if he needed it. Register said that he would need more paper and that he would bring his statement to the police department. Register did not bring the statement or photo to the police.
>
> **E. Lieutenant Christopher Swope's Testimony**
>
> {¶24} Lieutenant Christopher Swope ("Lt. Swope") testified that after L.P.'s disclosures at the police station, he went to Register's home to interview him. Register told Lt. Swope that he was aware of the sexual relationship between L.P. and I.P. and had tried to intervene, telling her it was wrong. Register also told Lt. Swope that he had a photo of L.P. and I.P. engaging in sexual activity. Register informed Lt. Swope that the photo was on a drive that was not at the residence. Lt. Swope asked Register to bring the photo to the police station later, but Register did not.

(ECF No. 8-1, PageID #: 241-48).

## III. State Procedural History

### A. Indictment, Trial, Verdict, and Sentencing

On August 31, 2023, a Cuyahoga County grand jury indicted Petitioner on two counts of

rape, two counts of complicity, one count of pandering obscenity involving a minor, two counts of endangering children, four counts of sexual battery, one count of tampering with evidence, and one count of falsification. (ECF No. 8-1, PageID #: 151-57). Petitioner pleaded not guilty to all charges. (*Id.* at PageID #: 158). In preparation of trial, Petitioner's counsel submitted notice of an expert witness, Dr. Sandra McPherson, to the court and the prosecution. (*Id.* at PageID #: 160).

The case proceeded to trial. (*See* ECF No. 8-2). After the prosecution rested, the trial court granted Petitioner's Rule 29 motion on the falsification charge. (ECF No. 8-1, PageID #: 166). The defense rested without presenting any evidence. (*Id.*). After deliberation, the jury found Petitioner not guilty of pandering obscenity involving a minor and tampering with evidence but found him guilty of all remaining counts. (*Id.* at PageID #: 167). The trial court sentenced Petitioner to life imprisonment with parole eligibility after 60 years. (*Id.* at PageID #: 169-71, 249).

### B. Direct Appeal

Petitioner appealed his conviction to the Ohio Eighth District Court of Appeals. (ECF No. 8-1, PageID #: 172). Petitioner raised the following assignments of error on appeal:

1. The trial court erred in entering convictions which were against the manifest weight of the evidence, in derogation of Defendant's rights to due process of law, as protected by the Fifth and Fourteenth Amendments to the United States Constitution.

2. The trial court erred in permitting the State to introduce testimony that Defendant had failed to make a statement, in derogation of Defendant's rights under the Fifth and Fourteenth Amendments to the United States Constitution.

3. The trial court erred in allowing the State to introduce evidence of other crimes.

4. The trial court erred in permitting testimony about delayed disclosure of a sexual abuse victim.

5. The trial court erred in considering uncharged conduct in sentencing the defendant.

(*Id.* at PageID #: 183-207). The State filed an opposition brief, and Petitioner filed a reply in support. (*Id.* at PageID #: 210-25, 227-39). On January 16, 2025, the appellate court affirmed Petitioner's convictions and sentence. (*Id.* at PageID #: 240-62).

Petitioner did not file a further appeal to the Ohio Supreme Court.

### C. Post Conviction Proceedings

On March 13, 2026, Petitioner filed a pro se motion for leave to file a delayed petition for state post-conviction relief. (ECF No. 8-1 at PageID #: 263-76). Within the motion for leave, Petitioner argued he received ineffective assistance of counsel because his trial counsel failed to present exculpatory documentary evidence, alibi evidence, or expert testimony. (*Id.*). The trial court denied Petitioner's motion for leave on March 26, 2026, noting that did not meet the standard for the exception under Ohio Revised Code § 2953.23. (*Id.* at PageID #: 292). As to Petitioner's ineffective assistance claim, the court noted that such a claim was "barred by res judicata" and all of the documents Petitioner relied on were "readily available prior to trial." (*Id.*).

Petitioner appealed the denial of leave to the Ohio Eighth District Court of Appeals. (*Id.* at PageID #: 293-94). Petitioner filed his brief on June 3, 2026; the State filed an opposition on July 13, 2026; and Petitioner filed a reply on July 23, 2026. (*Id.* at PageID #: 303-70). The matter remains pending before the state appellate court.[2] (*See id.* at PageID #: 382).

## IV. Federal Habeas Corpus Petition

Petitioner filed his pro se petition for a writ of habeas corpus on June 3, 2026. (ECF No. 1). Petitioner asserts the following grounds for relief:

1. Trial counsel rendered ineffective assistance by failing to investigate and present critical exculpatory evidence directly contradicting essential elements

---

[2] *See generally Ohio v. Register*, No. CA-26-1176378, https://cpdocket.cp.cuyahogacounty.gov/COA_CaseInformation_Docket.aspx?q=bURIC_r0V80dGUwzson0bXz_SeJmTt8p0jLXGh605iQ1.

of the charged offenses and by failing to present expert evidence bearing upon the reliability of delayed disclosures.

2. The State improperly introduced testimony inviting the jury to draw adverse inferences from Petitioner's failure to provide a written statement, thereby using Petitioner's post-Miranda-warning silence as substantive evidence of guilt.

3. Petitioner was denied his constitutional right to testify and assist in his own defense because trial counsel failed to secure a knowing, intelligent, and voluntary waiver of Petitioner's right to testify before resting without presenting a defense.

4. Petitioner's conviction rests on an internally inconsistent evidentiary record marked by materially conflicting witness testimony and a lack of corroborating evidence.

(*Id.* at 1-2). Additionally, Petitioner argues that "the combined effect of those violations rendered [his] trial fundamentally unfair." (*Id.* at 25). Consistent with his acknowledgment in the petition that he had not presented each of these claims to the state courts and that the petition was filed more than a year after his conviction became final, Register filed motions for equitable tolling of the statute of limitations set out in 28 U.S.C. § 2244 and for a stay and abeyance pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005). (ECF Nos. 2, 3).

On August 21, 2026, Respondent filed a return of writ, arguing that the petition is time-barred and equitable tolling is not warranted; Register's grounds for relief are non-cognizable and/or procedurally defaulted; and Register has not shown that a stay is warranted. (ECF No. 8). Petitioner filed a traverse on September 21, 2026. (ECF No. 9).

## V. Legal Standards

Because Petitioner is a state prisoner seeking federal habeas relief, his petition is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), and corresponding case law.

### A. Statute of Limitations

AEDPA imposes a one-year statute of limitations upon all applications seeking a writ of habeas corpus under 28 U.S.C. § 2244(d)(1). The one-year period begins to run from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). The one-year statute of limitations is tolled for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). A petitioner may seek equitable tolling by showing "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010). Additionally, the AEDPA statute of limitations may be subject to equitable tolling through a credible showing of actual innocence. *See Souter v. Jones*, 395 F.3d 577, 589-90 (6th Cir. 2005).

**B. Exhaustion**

Under 28 U.S.C. § 2254(b), a state prisoner seeking federal habeas relief must exhaust "the remedies available in the courts of the State" or show that (1) there is an absence of available State corrective process or (2) circumstances exist that render such process ineffective to protect the prisoner's rights. "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan*

*v. Boerckel*, 526 U.S. 838, 842 (1999). To satisfy the exhaustion requirement, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* at 845. However, when a petitioner fails to exhaust all his state law remedies but can no longer do so under state law, the claim becomes procedurally defaulted. *Id.* at 848.

## VI. Discussion

In his petition, Register acknowledges that his claims are likely untimely and/or unexhausted, indicating he filed the petition "in order to preserve his right to federal review in light of statute-of-limitations concerns caused by post-judgment attorney misconduct." (ECF No. 1 at 2). Specifically, Register represents that after the conclusion of his direct appeal, he retained counsel to file a state post-conviction petition; counsel represented that such a petition had been filed; Register did not learn until February 2, 2026, that no filing existed; and, upon learning no state petition had been filed, he promptly began to seek relief in the state courts. (*Id.* at 2-3, 5-7). Based on these facts, Register requests that the Court find equitable tolling of the federal habeas statute of limitations warranted. (ECF No. 2).

Respondent argues the petition is untimely because Register's conviction became final on March 3, 2025 (forty-five days after the appellate court decision) such that the statute of limitations began to run on March 4, 2025, and ran until it expired on March 4, 2026. (ECF No. 8 at 11). Respondent asserts that because Register learned that no state post-conviction petition had been filed on February 2, 2026, and provides "no explanation for [his] failure to file a protective [federal] petition by March 4, 2026," he failed to pursue his rights diligently as required to justify equitable tolling. (*Id.* at 14-17).

In his traverse, Petitioner concedes that "Respondent correctly identifies March 4, 2026, as the expiration date under the ordinary calculation of 28 U.S.C. § 2244(d)(1)(A)." (ECF No. 9 at 2). However, he renews his argument that he is entitled to equitable tolling, asserting that his retained counsel's misrepresentations amount to extraordinary circumstances and he has been pursuing his rights diligently because he "acted promptly after discovering counsel's failure" by pursuing relief in the state courts and "also pursued federal habeas relief," indicating that he filed his federal petition on May 13, 2026, but it was rejected because it exceeded the applicable page limitation. (*Id.* at 3-4).

Because the parties agree that Register did not file the petition until after the March 4, 2026, expiration of the statute of limitations, the relevant question is whether equitable tolling is appropriate. To be entitled to equitable tolling, Petitioner must show that he sought to diligently exercise his rights and that some extraordinary circumstance stopped him from filing in time. *Hemwall v. Douglas*, 184 F.4th 469, 473 (6th Cir. 2026) (citing *Holland*, 560 U.S. at 649). To establish extraordinary circumstances justifying equitable tolling, Petitioner must (1) "identify an extraordinary factor" and (2) show that factor prevented him from filing on time. *Id.* Thus, there must be "a causal link between the extraordinary circumstance and the late filing." *Id.*

The undersigned agrees with Respondent that Petitioner has not carried his burden of showing that he is entitled to equitable tolling. Even if the Court were to accept all of Petitioner's representations as facts and assume, without deciding, that his state post-conviction counsel's actions amounted to the type of extraordinary factor that would justify equitable tolling, Petitioner still fails to show how his attorney's actions caused the approximately three-month delay in filing his federal habeas petition. Petitioner explicitly recognizes that he learned "no state collateral proceeding existed to provide [§2244(d)(2)'s] statutory tolling" "approximately one month before

the federal limitations period expired." (ECF No. 9 at 5). However, he presents no argument as to why he was unable to file a protective federal petition in the month before the statute expired. Said another way, by Petitioner's own admission, he learned that counsel never filed a state post-conviction petition *before* the federal statute expired and while he still had time to file a timely federal petition but fails to provide any explanation as to why he could not file a federal petition in that time, especially given he was actively seeking relief in the state courts. Thus, Petitioner has failed to show that his attorney's actions *caused* him to miss his federal deadline, and, in the absence of such a showing, Petitioner is not entitled to equitable tolling. *See Taylor v. Palmer*, 623 F. App'x 783, 787 (6th Cir. 2015) (absent a showing of extraordinary circumstances, "a court should not extend limitations by even a single day") (quoting *Jurado v. Burt,* 337 F.3d 638, 643 (6th Cir.2003)).

Because Petitioner is not entitled to equitable tolling, the petition is untimely and properly dismissed.[3] Should the Court accept this finding and dismiss the petition, Petitioner's motion for stay and abeyance so that he may exhaust his state remedies will be moot.

## VII. Certificate of Appealability

A habeas petitioner may not appeal the denial of his application for a writ of habeas corpus unless a judge issues a certificate of appealability ("COA") and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c) ("A certificate of appealability may issue … only if the applicant has made a substantial showing of the denial of a constitutional right.").

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

[3] Having concluded the petition is untimely, the undersigned declines to address Respondent's arguments that Petitioner's claims are non-cognizable and/or procedurally defaulted.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, the petition is untimely and should be dismissed. If the Court accepts the foregoing recommendation, Petitioner has not shown that jurists of reason would find it debatable whether his petition was timely. He would then not be entitled to a certificate of appealability. Thus, I recommend that the Court not issue a certificate of appealability.

**VIII. Recommendation**

The petition is untimely and Petitioner has not shown that equitable tolling is warranted. Thus, I recommend that the Court deny his motion for equitable tolling, deny the petition in its entirety, deny the motion for stay and abeyance as moot, and not grant Petitioner a certificate of appealability.

Dated: September 30, 2026

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).